# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | | |
|---|---|---|
| **LEWIS POTTER,** | ) | No. 6:10-CV-01527-SI |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____) | | |

**SIMON, District Judge.**

Lewis Potter seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Social Security Disability insurance benefits under Title II of the Social Security Act. Mr. Potter asserts that the Administrative Law Judge ("ALJ") erred when he made an adverse credibility determination against Mr. Potter, discounted some of the medical opinions in the record, disregarded lay witness statements, and relied on the testimony of a vocational expert ("VE") that Mr. Potter argues was not supported by substantial evidence. For the reasons that follow, the Commissioner's decision is affirmed.

# BACKGROUND

Mr. Potter left his last job as a gas station attendant in June 2002 following a confrontation with a co-worker. Tr. 259. He alleges that his chest pain started in July 2002, when he was forty years old. Tr. 260. Mr. Potter filed for Social Security Disability insurance benefits in 2004, alleging an onset date of July 9, 2002. Tr. 83. After three hearings on the application, ALJ Peter Baum found Mr. Potter not disabled. Mr. Potter sought judicial review, and upon the joint stipulation of the parties, this court remanded the case to the agency for a new hearing. Tr. 325.[1] On remand, ALJ John Madden, Jr., held an additional hearing and issued another decision finding Mr. Potter not disabled. This was the final decision of the agency for which Mr. Potter now seeks judicial review.

## I.    Evidence Before the ALJ

### A.  Medical Evidence

In the fall of 2002, Mr. Potter repeatedly visited his physician, Stephen Pratt, MD, with complaints of "right upper quadrant pain." Tr. 176-178. Mr. Potter "exhibited some tenderness at the costal margin on the right"; however, all of his tests were normal. Tr. 176-178, 187-188. Mr. Potter reported that no medication other than Vicodin alleviated his pain. Tr. 176. Dr. Pratt opined that the symptoms could be due at least in part to costochondritis.[2] *Id.*

---

[1] On remand, the ALJ was directed to consider further the medical opinions of Dr. Levin and Dr. Jensen, as well as the lay evidence of Mr. Potter's wife and mother-in-law. *See* Tr. 330-331. The ALJ was also directed, as needed, to reevaluate Mr. Potter's residual functional capacity and obtain additional VE testimony. Tr. 331.

[2] Costochondritis is the inflammation of a rib or the cartilage connecting a rib. It usually goes away within weeks and is typically treated with common pain relievers. *See* MedlinePlus, "Costochondritis," *http://www.nlm.nih.gov/medlineplus/ency/article/000164.htm*.

At Mr. Potter's request, Dr. Pratt referred Mr. Potter to Kris Jacobson, MD, for a second opinion. Since "extensive evaluation" had not indicated any "organic disease," Dr. Jacobson concluded, "I strongly suspect [the pain] most likely is related to costochondritis." Tr. 180-181. Dr. Jacobson recommended that Mr. Potter "use nonsteroidal anti-inflammatory agents as needed and try to avoid activities that tend to aggravate the symptoms." Tr. 181.

Mr. Potter first received treatment from Greg Hoffman, MD, in June 2003. Dr. Hoffman repeatedly encouraged Mr. Potter to stop smoking, which could exacerbate his esophageal condition; in 2003, Mr. Potter tried to quit smoking, but by 2004 he was "not interested in quitting smoking." Tr. 172-175. Mr. Potter reported to Dr. Hoffman that his "right upper quadrant abdominal pain" was "worse when he exercises" and that he used ibuprofen for this "discomfort." Tr. 175. All tests appeared normal. Tr. 172, 186. Dr. Hoffman opined that the cause of the symptoms could be costochondritis or postherpetic neuralgia ("shingles"). Tr. 172.

In June 2004, Dr. Hoffman filled out a form for Mr. Potter to attend boy scout camp with his son. Tr. 173, 265. Dr. Hoffman concluded that Mr. Potter was "pretty normal for boy scout camp," but that he could not guarantee Mr. Potter would not have a heart attack "as he is hiking around," given his smoking habit and uncontrolled cholesterol. Tr. 173. Dr. Hoffman also noted that Mr. Potter "continues to have his right upper quadrant costochondritis, which is relieved with ibuprofen; however, this is the excuse he uses for not working." *Id.*

In January 2005, Dr. Hoffman referred Mr. Potter to Daniel Saviers, MD. Dr. Saviers noted that Mr. Potter had "no specific abnormal pain behaviors. He moves quickly and smoothly without guarding. … Compression of the rib cage is nontender and there is no specific tenderness of the costochondral cartilage. ... He can take a deep breath and cough without creating any

increased pain." Tr. 248. Based on this examination, Dr. Saviers was "concerned [that Mr. Potter] has some somatic overfocus and is very concerned about being on disability." *Id.* Dr. Saviers thought the diagnosis was more likely shingles than costrochondritis. *Id.*

Mr. Potter first visited Abdul Basit, MD, in April 2005, for what he thought would be a disability evaluation. Dr. Basit explained this was not the purpose of the examination. Tr. 237. Dr. Basit noted that Mr. Potter's right chest wall pain was of "[u]nknown etiology" and that the work-up was "[n]egative." Tr. 239. He "suspect[ed] costochondritis." *Id.* He agreed to prescribe Mr. Potter Vicodin for a short duration and warned him of its addictive nature; he also counseled Mr. Potter to quit smoking, but Mr. Potter "d[id] not want to quit at this time." *Id.*

Dr. Basit referred Mr. Potter to Lawrence Levin, MD, for a rheumatology consultation in July 2005. Mr. Potter reported to Dr. Levin that the chest pain had been getting worse and was averaging "about a three to four over ten in severity," with exertion increasing the pain "to a seven over ten level." Tr. 225. Dr. Levin noted that some of the right ribs were tender "rather diffusely" with "no highly focal areas of point tenderness"; however, "[a]ny palpitation in this area caused the patient a considerable amount of discomfort." *Id.* The tests ordered by Dr. Levin all came back normal. Tr. 221, 223. Dr. Levin tried local injections, but these did not alleviate Mr. Potter's pain. Tr. 219, 221. After several visits, Dr. Levin noted that Mr. Potter still reported his pain having "a high degree of severity with [Mr. Potter] unable to work," but Dr. Levin did not have any more treatment options that might help and therefore ended his consultation. Tr. 220. Dr. Levin also declined to provide Mr. Potter with a handicap parking pass, which Dr. Levin did not feel Mr. Potter qualified for, and he declined to fill out a disability evaluation for Mr. Potter. Tr. 224.

OPINION AND ORDER, Page 4

Mr. Potter started seeing Heather Kahn, MD, in May 2006. Tr. 214. She agreed to provide Mr. Potter with a disability evaluation. Tr. 208, 210. In a letter dated September 8, 2006, Dr. Kahn acknowledged that Mr. Potter's "EGD, stress tests, chest x-ray, ultrasound of the abdomen, [and] CT of the abdomen" were all negative. Tr. 206. She noted, however, that Mr. Potter reported to her that his chronic pain was a ten over ten. *Id.* She opined that "he is disabled due to chronic costal chondritis secondary to cartilaginous separation at the ribs." *Id.*

Dr. Kahn wrote a subsequent letter in March 2008,[3] in which she reported that Mr. Potter had experienced pain in his right chest wall since July 2002. Tr. 253. The pain "is exacerbated by stretching, reaching, sitting or standing for long periods of time." She reported that mowing the yard incapacitates Mr. Potter for one and a half weeks and that he is unable to grocery shop without using a wheelchair. She noted that he uses Vicodin and Lidoderm patches to help control the pain. He had been offered "nerve ablation" as a more permanent treatment, but he did not think "the risk profile is satisfactory." She again opined that he was disabled due to costochondritis. Specifically, she opined that his manipulative abilities were limited and that he was unable to perform sustained light work or lift over ten pounds. *Id.*

In March 2010, Mr. Potter was examined by Gregory Grunwald, DO, who also reviewed Mr. Potter's medical history. Dr. Grunwald noted that Mr. Potter's "major limitations at this time are secondary to pain he states in his anterior chest wall." Tr. 383. He assessed that Mr. Potter would be limited in his ability to stand, sit, and walk, and that he could lift and carry at least fifteen or twenty pounds on his left side but only five pounds on his right. Tr. 384. He noted that Mr. Potter had been encouraged to have a nerve block procedure but had declined to do so. Dr.

---

[3] Mr. Potter's date last insured was December 31, 2007. To be eligible for benefits under Title II, Mr. Potter must demonstrate that he was disabled before this date.

OPINION AND ORDER, Page 5

Grunwald opined that if Mr. Potter is "having significant disabling pain that a nerve block would be reasonable as a next step in the patient's care management. If he were to receive a successful block of the nerves in the anterior chest wall, the patient would then regain 100% mobility and be fully gainfully employed...." Tr. 385. He assessed, however, that Mr. Potter was currently not employable beyond a sedentary job in which he could change his body position or stay reclined. *Id.* Dr. Grunwald concluded, "I am concerned that the focus of this patient's treatment has shifted from … a goal of treating to a search for assigning disability when there is a possible treatment that could alleviate this patient's current pain and eliminate the need for disability assignment." *Id.*

Scott Pritchard, DO, subsequently reviewed Mr. Potter's medical history on behalf of the state.  He concluded that Mr. Potter would be limited in his ability to lift, carry, walk, sit, and climb. Tr. 393-394. Because of his use of narcotics for pain control, Mr. Potter should not be exposed to hazards on the job. Tr. 396. In reaching these conclusions, Dr. Pritchard gave weight to the opinions of Dr. Kahn and Dr. Grunwald that Mr. Potter was limited in his functional capacity. He noted these opinions were consistent with Mr. Potter's statements, which had themselves been consistent since 2002. Tr. 398. Dr. Pritchard explained, however, that Mr. Potter's "condition is typically self-limiting and would not persist or cause the severity of his stated limitations. He has not followed through on all recommendations for treatments that could potentially improve his condition. … His statements are partially credible in this regard." Tr. 397.

ALJ Baum also heard testimony from a medical expert, Joseph Jensen, MD, during a December 2006 hearing. Dr. Jensen had reviewed Mr. Potter's file and was given a summary of

OPINION AND ORDER, Page 6

Mr. Potter's testimony. Dr. Jensen testified, "I don't find objective evidence [to] support such an extreme degree of limitations. I think that [Mr. Potter] would be precluded from certain activities particularly with his right upper extremity for vigorous grasping. I don't see how … such a condition would in any way interfere with either standing, walking or prolonged sitting." Tr. 288. Dr. Jenson did agree, however, that there would be a limitation on how much Mr. Potter could lift. Tr. 269.

### B.  Testimony of Mr. Potter and Lay Witnesses

Before ALJ Baum in 2006, Mr. Potter testified that he spends most of his time resting on the couch or in bed. Tr. 261. He has difficulty sleeping because of the pain and sleeps on the couch so that he will not aggravate the pain by rolling over. Tr. 259. Mr. Potter used to go camping but would spend most of his time resting in his tent, which someone else would set up for him. Tr. 264. In the summer of 2004, he attended a three-day cub scout camp with his son, during which he stayed at the camp site and did not participate in hiking or other activities. Tr. 265. He attended another boy scout camp in July 2006. Tr. 257. Through 2004, he would occasionally go hunting and fishing. Tr. 265-266. Before ALJ Madden in August 2010, Mr. Potter testified that he declined the nerve block procedure because he was worried that it could exacerbate his condition and that it would make it harder for him to discern if he were having a heart attack, for which he is at risk. Tr. 408.

Mr. Potter's wife, Janet Potter, testified before ALJ Baum in September 2006. She explained that her husband "[j]ust doesn't work. I mean, he can't do anything. He does a load of laundry. Then he's down for two, three hours. … Before that he never was down. He was a worker." Tr. 277. Asked if she saw her husband in pain, Ms. Potter testified, "I have never seen

this man cry until now. When the pain gets really bad, he's in tears." *Id.* Her husband used to do the yard work, but now friends do it for them. *Id.* Ms. Potter described her husband as having a shorter temper when he is in pain and remarked that "[h]e is just a different type of man than what he used to be, really, honestly." Tr. 278.

Mr. Potter's mother-in-law, Arlene Halvorson, submitted a third-party function report dated August 31, 2004. Tr. 140. She lives on the same property and interacts with Mr. Potter daily. *Id.* She stated he does some house work, like washing and folding clothes, cleaning dishes, and preparing simple meals for himself and his son. *Id.* She reported that he sometimes helps with mowing the lawn, but that he has to rest in between chores. Tr. 142. He participates weekly in church and boy scouts with his son. Tr. 144. "He loved to hunt & fish but no longer can do it for more than an hour at a time." Tr. 145. She stated that Mr. Potter could walk about a block, but then would need two hours to rest. *Id.*

In his own function report, completed at the same time, Mr. Potter reported that his mother-in-law and wife did most of the cooking. Tr. 158-159. When he cooks, he has to rest for two to six hours. Tr. 159. Doing the laundry takes him two or three days, and mowing the lawn takes six or eight hours. *Id.* When describing his interests, Mr. Potter reported that he goes fishing one or two times a year, but that he used to go fishing much more often. Tr. 161. He attends church and boy scouts and visits friends in their houses. *Id.* He could walk twenty-five to fifty yards, but then would have to rest one to eight hours. Tr. 162.

## II.    The Sequential Analysis

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or

can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C.

§ 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining

whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v.*

*Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520). The *Keyser*

court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2)
> Is the claimant's impairment severe? (3) Does the impairment meet or equal
> one of a list of specific impairments described in the regulations? (4) Is the
> claimant able to perform any work that he or she has done in the past? and
> (5) Are there significant numbers of jobs in the national economy that the
> claimant can perform?

*Id.* at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

The claimant bears the burden of proof for the first four steps in the process. If the

claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.

*Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001); *see Bowen v. Yuckert*, 482 U.S.

137, 140-41 (1987); 20 C.F.R. § 404.1520 (setting forth general standards for evaluating

disability).

The Commissioner bears the burden of proof at step five of the process, where the

Commissioner must show the claimant can perform other work that exists in significant numbers

in the national economy, "taking into consideration the claimant's residual functional capacity,

age, education, and work experience." *Tackett v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999); *see*

*also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy"). If the

Commissioner fails to meet this burden, then the claimant is disabled, but if the Commissioner

proves the claimant is able to perform other work which exists in the national economy, then the

claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

## III.    The ALJ's Decision

In his decision of August 25, 2010, ALJ Madden applied the sequential analysis and found Mr. Potter not disabled. At step one, the ALJ found that Mr. Potter met the insured status requirements of the Social Security Act through December 31, 2007, and that he did not engage in substantial gainful activity from the alleged onset date of July 9, 2002, through December 31, 2007. Tr. 313. At step two, the ALJ found that Mr. Potter had a severe impairment of costochondritis as of the date last insured (December 31, 2007). *Id.* At step three, the ALJ found that Mr. Potter did not have an impairment or combination of impairments that met or equaled one of the listed impairments. Tr. 314.

The ALJ found that Mr. Potter had the residual functional capacity ("RFC") "to perform light exertional work except the claimant can lift and carry up to 10 pounds occasionally and frequently with the right upper extremity and up to 20 pounds occasionally and frequently with the left upper extremity." *Id.* There was no limitation on Mr. Potter's ability to sit, stand, and walk. *Id.*  In reaching this finding, the ALJ noted that Mr. Potter's "medically determinable impairment could reasonably be expected to cause some of the alleged symptoms; however, the claimant's and third-party statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC finding. Tr. 315. The ALJ described the lack of objective medical evidence that would support Mr. Potter's alleged limitations; noted inconsistencies in the reporting of Mr. Potter's activities of daily living and his alleged pain symptoms; and remarked on Mr. Potter's unwillingness to seek

vocational rehabilitation or a treatment that multiple doctors suggested would provide him relief. Tr. 314-317. The ALJ also gave no weight to the medical assessments of Dr. Kahn because "they are not supported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with other substantial evidence in the case record." Tr. 317. The ALJ gave limited weight to the opinions of Dr. Grunwald and Dr. Pritchard to the extent they relied on the opinion of Dr. Kahn. *Id.* The ALJ noted, however, that both Dr. Grunwald and Dr. Pritchard remarked on the lack of objective evidence to support Mr. Potter's self-reported limitations and on his unwillingness to undergo treatment that could end his pain. *Id.*

At step four, the ALJ found that Mr. Potter could not perform any past relevant work, given his RFC. At step five, the ALJ relied on VE's the testimony at the hearing before ALJ Baum in March 2007. Based on this testimony, the ALJ found that Mr. Potter could perform the work of a courier or a table worker,[4] both of which positions are available in significant numbers in the regional economy. Tr. 318-319. As a result, the ALJ concluded that Mr. Potter was not disabled. *Id.*

## ANALYSIS

### I.    Standard of Review

The court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence.  *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[4] A "table worker" in the textile industry, as defined by the Dictionary of Occupational Titles, assembles fabric decorations. It is classified as "light work" requiring the exertion of up to twenty pounds occasionally and/or up to ten pounds frequently. *See Dictionary of Occupational Titles* (4th ed. 1991), 734.687-014.

OPINION AND ORDER, Page 11

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

## II.    Credibility Determination

Mr. Potter challenges the ALJ's finding that his testimony was not credible. Mr. Potter has produced objective medical evidence of an underlying impairment that could reasonably be expected to cause some degree of symptoms; therefore, the ALJ may reject Mr. Potter's testimony about the severity of those symptoms only if he provides specific, clear and convincing reasons for doing so. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). These reasons may include:  "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)) (quotation marks omitted).

Mr. Potter asserts that the ALJ did not give specific reasons for disbelieving his testimony. To the contrary, the ALJ did provide several specific reasons for finding Mr. Potter not credible. The ALJ noted Mr. Potter's inconsistent statements; for example, Mr. Potter told Dr. Levin that he had quit his job as a roofer in 2003 because of pain, but this account conflicted with Mr. Potter's testimony and earlier reports that he had quit his last job as a gas attendant in 2002 for personal reasons. *See* Tr. 316; *Tommasetti*, 885 F.3d at 1040 (inconsistencies in

claimant's statements can justify an adverse credibility determination). The ALJ also noted that

Mr. Potter's "activities, including painting and attending a boy scout camp with full physician

clearance, are inconsistent with a disabling level of pain." Tr. 316; *see also* Tr. 314 (noting that

Mr. Potter listed fishing and hunting as hobbies). An ALJ may draw an adverse credibility

finding from inconsistencies between the alleged severity of the claimant's symptoms and his

self-reported activities. *See Valentine v. Commissioner*, 574 F.3d 685, 693 (9th Cir. 2009)

(affirming adverse credibility determination where claimant reported exercising, gardening and

engaging in community activities despite allegedly disabling fatigue); *Tommasetti*, 885 F.3d at

1040 (affirming adverse credibility determination where claimant traveled to Venezuela to care

for a family member despite allegedly disabling pain). Mr. Potter disputes the ALJ's

interpretation of the evidence regarding the boy scout camp and his visit to the emergency room

after using an air gun to paint. Because the ALJ's interpretation of this evidence was reasonable,

however, this court may not substitute its judgment for that of the ALJ. *See, e.g.*, *Batson v.*

*Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004); *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir.

1989).

      The ALJ further noted that several physicians had recommended a nerve block procedure

that is a common treatment for the pain alleged by Mr. Potter. *See* Tr. 315 (Dr. Jensen); Tr. 317

(Drs. Grunwald and Pritchard). It is permissible to infer that a claimant's pain is not disabling if

the claimant declines to seek available treatments. *See Tommasetti*, 885 F.3d at 1039. Mr. Potter

correctly notes that a conservative approach to treatment "is not a proper basis for rejecting the

claimant's credibility where the claimant has a good reason for not seeking more aggressive

treatment." *Carmickle v. Commissioner*, 533 F.3d 1155, 1162 (9th Cir. 2008). But Mr. Potter has

not identified any good reason for his refusal to pursue a procedure that could end his pain: he has not alleged that he lacks insurance coverage, for example, or pointed to any medical opinion that the treatment poses significant risks. *See Fair*, 885 F.2d at 603 ("While there are any number of good reasons for not [following a prescribed course of treatment], … a claimant's failure to assert one, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." (citation omitted)).

Most significantly, the ALJ described at length the lack of objective medical evidence that would support Mr. Potter's alleged symptoms. Tr. 315-317. The ALJ noted Dr. Jenson's testimony that Mr. Potter's asserted limitations are not supported by objective medical evidence. Tr. 315. He noted Dr. Jacobson's comment that "extensive" evaluations had not identified a significant medical problem. *Id.* He noted Dr. Hoffman's comment that Mr. Potter's chest pain "is the excuse he uses for not working." Tr. 316.  He noted Dr. Saviers' opinion that Mr. Potter's condition may have "a somatic overfocus" and that Mr. Potter appeared "very concerned about being on disability." *Id.* He noted Dr. Levin's comment that all objective testing had been negative, as well as Dr. Levin's opinion that Mr. Potter did not qualify for a disabled parking pass. *Id.* He pointed out that even Dr. Kahn acknowledged that all testing had been negative. *Id.* He emphasized that Dr. Grunwald believed that Mr. Potter could regain 100% mobility if he underwent the nerve block procedure; he further noted Dr. Grunwald's concern that Mr. Potter was looking not so much for treatment as for an assignment of disability. Tr. 317. And he noted that Dr. Pritchard (the non-examining state physician) opined that Mr. Potter's condition would not typically persist or cause the severity of limitations alleged by the claimant. *Id.* With all of this medical evidence, in addition to the other specific reasons provided for the credibility

OPINION AND ORDER, Page 14

determination, it was reasonable for the ALJ to discount Mr. Potter's allegation of disabling pain. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

In sum, the ALJ provided specific, clear and convincing reasons for finding Mr. Potter's testimony not credible. *Cf. Batson*, 359 F.3d at 1197 (affirming ALJ's negative credibility determination based on examining physicians' skepticism of the alleged severity of claimant's symptoms; lack of objective medical evidence supporting claimant's alleged symptoms; and contradictions in the claimant's self-reporting of his condition). Mr. Potter has not presented sufficient grounds for overturning the ALJ's credibility determination.

## III. Medical Opinions

### A. Dr. Kahn

Mr. Potter argues that the ALJ improperly discounted the medical opinion of Dr. Kahn, his treating physician. In particular, he asserts that the ALJ did not identify the evidence in the record that he found to be inconsistent with Dr. Kahn's testimony.

Although a treating physician's opinion is afforded greater weight than that of an examining or reviewing physician, it is not necessarily conclusive of the claimant's physical condition or state of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). "[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole … or by objective medical findings." *Batson*, 359 F.3d at 1195 (citation omitted). When other medical evidence contradicts the treating physician's opinion, the ALJ may disregard the treating physician's opinion if he provides specific, legitimate reasons for doing so that are based on substantial evidence. *See Carmickle*, 533 F.3d at 1164; *Tommasetti*, 533 F.3d at

OPINION AND ORDER, Page 15

1041; *Magallanes*, 881 F.2d at 751. The ALJ here provided specific and legitimate reasons for disregarding Dr. Kahn's opinion, and those reasons were supported by substantial evidence.

The ALJ stated that he gave no weight to Dr. Kahn's assessments because they were not supported by objective medical evidence and were inconsistent with other substantial evidence in the record. Tr. 317. He noted that Dr. Kahn herself acknowledged that all of Mr. Potter's tests had been negative. Tr. 316. The ALJ also described at length the opinions of other physicians, including their comments that all tests were negative and their conclusions that Mr. Potter's condition was not as limiting as Dr. Kahn later described. Tr. 315-317; *see also Magallanes*, 881 F.2d at 753 (ALJ can meet burden for disregarding treating physician's opinion "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings" (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)) (quotation marks omitted)). The ALJ particularly marked Dr. Kahn's statement that Mr. Potter could not shop without the use of a wheelchair, a limitation for which there was no medical basis in any of the medical opinions. Tr. 317. The ALJ also noted that Dr. Kahn had only "treated the claimant a handful of times over a four-month period," compared to Mr. Potter's lengthier relationships with other treating physicians, like Dr. Pratt and Dr. Hoffman. *Id.* These were sufficient specific reasons, supported by substantial evidence, for setting aside the medical opinion of Dr. Kahn. *Cf. Batson*, 359 F.3d at 1195 (ALJ may discount the opinion of a treating physician where the opinion was not supported by objective evidence, was contradicted by other statements and assessments of the claimant's condition, and was based on the claimant's subjective account of his pain).

OPINION AND ORDER, Page 16

B.  *Dr. Grunwald, Dr. Pritchard, and Dr. Levin*

Mr. Potter also disputes the ALJ's refusal to give full weight to the medical opinions of Dr. Grunwald, an examining physician, and Dr. Pritchard, a reviewing physician. The ALJ gave Dr. Grunwald's opinion limited weight because it was based on Mr. Potter's self-reported limitations. Tr. 317. "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti* , 533 F.3d at 1041; *see also Thebo v. Astrue*, 436 F. App'x 774, 776 (June 7, 2011); *Fair*, 885 F.2d at 605. The ALJ gave no weight to Dr. Pritchard's assessment because it relied on the opinions of Dr. Kahn and Dr. Grunwald. Tr. 317. An ALJ may discount the opinion of a physician when it relies on another physician's opinion that has already been discounted. *See Batson*, 359 F.3d at 1195; *see also Tommasetti*, 533 F.3d at 1041(ALJ does not have to accept opinion of a physician that defers to another physician's assessment, especially if the deferring physician expressed doubts as to the claimant's limitations). These were adequate, specific reasons for discounting the opinions of these doctors.

Mr. Potter also argues that the ALJ did not adequately account for the remark in Dr. Levin's records that Mr. Potter's pain was of a "high degree of severity with [patient] unable to work." *See* Tr. 219-220. This comment would necessarily reflect Mr. Potter's own reporting of the severity of his symptoms, which the ALJ reasonably discounted. The ALJ's consideration of Dr. Levin's medical opinion was adequate.

## IV.  Lay Witnesses

Mr. Potter asserts that the ALJ did not provide germane reasons specific to Ms. Potter and Ms. Halvorson when he found their statements less than fully credible. "Lay testimony as to

a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The ALJ acknowledged the evidence provided by Ms. Potter and Ms. Halvorson but concluded that "the claimant's and third-party statements concerning the intensity, persistence and limiting effects of [Mr. Potter's] symptoms are not credible to the extent they are inconsistent" with the RFC finding. Tr. 315.

As in *Lewis*, the ALJ here "at least noted arguably germane reasons for dismissing the family members' testimony, even if he did not clearly link his determination to those reasons." *Lewis*, 236 F.3d at 512. The ALJ's summary of the two lay witness statements indicates their contradictory nature: he noted that Ms. Halvorson "confirmed that the claimant does house and yard work during the day; he shops for up to an hour at a time," while Ms. Potter "testified that '[Mr. Potter] just doesn't work,' is down for 2 or 3 hours after doing a load of laundry, and that friends do their yard work." Tr. 315. As in *Lewis*, the ALJ also summarized the medical evidence that contradicted the lay witnesses' account of the degree of severity of Mr. Potter's symptoms. *See Lewis* at 511; *see also Valentine*, 574 F.3d at 694 (ALJ may discount lay witness testimony when based on the subjective complaints of the claimant and the claimant's allegations have already been found not credible). Although the ALJ could have been more clear in identifying his reasons for disregarding the lay witness evidence, the decision as a whole provides germane reasons for discrediting the statements of Ms. Potter and Ms. Halvorson.[5]

---

[5] As the Ninth Circuit has explained, it is not necessarily reversible error when the ALJ fails to explicitly link his reasons to the rejection of certain evidence, as long as his reasoning is clear from his decision. *Cf. Magallenes*, 881 F.2d at 755 ("It is true that the ALJ did not recite the magic words, 'I reject Dr. Fox's opinion about the onset date because…' But our cases do not require such an incantation. As a reviewing court, we are not deprived of our faculties for

## V.       Vocational Expert

Finally, Mr. Potter argues that the ALJ erroneously relied on a VE's testimony that conflicted with the Dictionary of Occupational Titles ("DOT").[6] The ALJ may only rely on a VE's testimony that deviates from the DOT classification for a job if there is persuasive evidence in the record for doing so. *Tommasetti*, 533 F.3d at 1042. The ALJ cannot rely on his own speculation or the VE's "brief and indefinite testimony" to justify the deviation. *Id.*

ALJ Madden heard testimony from a new VE at the August 2010 hearing. The hypothetical he posed to the VE, however, described a claimant restricted to lifting no more than ten pounds occasionally, which corresponds to sedentary work. Tr. 416. In his decision, ALJ Madden found that Mr. Potter had the RFC to lift up to twenty pounds on his left side, which corresponds to light work. Tr. 314. Presumably for this reason, ALJ Madden relied not on the new VE evidence, but on the testimony of the previous VE at the March 2007 hearing before ALJ Baum. *See* Tr. 318-319.

At that hearing, ALJ Baum first posed a hypothetical in which the claimant could not lift objects over his shoulder on his right side or do any vigorous grasping or torqueing with his right hand. Tr. 303. Based on this hypothetical, the VE identified the occupations of courier (*see* DOT # 230.663-010) and table worker (*see* DOT # 734.687-014) as possible jobs Mr. Potter could sustain. *Id.* ALJ Baum and the VE then had the following colloquy:

---

drawing specific and legitimate inferences from the ALJ's opinion."); *see also Thebo*, 436 F. App'x at 776 (affirming rejection of lay witness testimony where ALJ summarized statements but did not clearly link his rejection of them to how they were inconsistent with the medical evidence).

[6] DOT is a publication of the U.S. Department of Labor that gives detailed requirements for a variety of jobs.  The Social Security Administration has taken administrative notice of the DOT.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 n.8 (9th Cir. 2007).

> ALJ:      Ms. Jones, I am asking you only about the Oregon jobs, because
> – please correct me if I'm wrong – but the Dictionary of Occupational Titles
> and its companion volume, the Selected Characteristics of Occupation, do
> not address the specifics of this hypothetical. Is that correct?
>
> VE:       That is correct, not specifically. Yes.
>
> ALJ:       So we can't actually apply those general national guidelines to
> this specific set of limitations. Correct, ma'am?
>
> VE:       Yes, Your Honor.
>
> ALJ:      Are you familiar with the table worker job and the courier job
> as they are performed in the State of Oregon?
>
> VE:       Yes, Your Honor….
> …
>
> ALJ:      As they are performed in the State of Oregon, do you believe
> that a gentleman of this age, education, work background and with the
> limits that I have given you [could] sustain these two jobs?
>
> VE: Yes, Your Honor.

Tr. 304. Next, ALJ Baum posed a hypothetical to the VE that reflects the twenty-pound

limitation that ALJ Madden ultimately included in his RFC finding. Tr. 304-305. The VE

confirmed in the hearing before Judge Baum that these additional limitations would not preclude

Mr. Potter from holding the occupations of courier and table worker. Tr. 305. In relying on this

earlier testimony in his decision, ALJ Madden noted that, "[p]ursuant to SSR 00-4p, the

vocational expert's testimony is consistent with the information contained in the Dictionary of

Occupational Titles." Tr. 319.

Mr. Potter argues that the first VE's testimony was not consistent with the DOT. To

establish this inconsistency, he points to ALJ Baum's reference in his initial decision to a

discrepancy between the VE's testimony and the DOT. *See* Tr. 20 ("Although the vocational

OPINION AND ORDER, Page 20

expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles, there is a reasonable explanation for the discrepancy. The vocational expert testified that although these jobs are not consistent with the DOT, [the VE] is familiar with the Oregon labor market and how these specific jobs are performed locally. As these jobs are performed locally, the jobs are consistent with above residual functional capacity."). ALJ Baum's decision, however, was vacated in its entirety (although on other grounds) and does not restrict ALJ Madden's ability to reach his own determinations.

Other than ALJ Baum's reference to a discrepancy in his now-vacated opinion, there is no evidence of an actual discrepancy on the record before this court. Social Security Ruling 00-4p, which binds the ALJ, provides that "[w]hen there is *an apparent* unresolved conflict between VE … evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE … evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000) (emphasis added). The ALJ must ask the VE if his or her testimony conflicts with the DOT, and "[i]f the VE's … evidence *appears to conflict* with the DOT, the adjudicator will obtain a reasonable explanation for *the apparent* conflict." *Id.* (emphasis added). That is, SSR 00-4p requires the ALJ to resolve a discrepancy only if a discrepancy is in fact "apparent." At the March 2007 hearing, the VE did not identify an actual discrepancy between her testimony and the DOT. Nor has Mr. Potter identified any actual discrepancy, and none is apparent upon the court's review of the DOT listings. On this record, there is no basis for disturbing the ALJ's finding that there was no discrepancy between the VE's March 2007 testimony and the DOT.

**CONCLUSION**

For the reasons stated above, the ALJ's finding that Mr. Potter is not disabled is

AFFIRMED.


Dated this 29th day of March, 2012.


/s/ Michael H. Simon
Michael H. Simon
United States District Judge